# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROGER ALLEN JOHNSON, : 
 : CIVIL ACTION
    Plaintiff, :
 :
  v. :
 : NO. 11-2603
EMELIA CAPUTO, RN, et al., :
 :
    Defendants. :

## MEMORANDUM

STENGEL, C.J.                                                                                                               September 28, 2017

Plaintiff Roger Allen Johnson brings this prisoner civil rights case against a prison employee, several medical professionals, and PrimeCare Medical, Inc., regarding his treatment at the Northampton County Prison.[1] He alleges that their conduct constituted violations of his constitutional rights and negligent infliction of emotional distress. The defendants now move for summary judgment as to all claims against them. For the following reasons, the defendants' motions for summary judgment are granted.[2]

---

[1] Following the disposition of the defendants' motions to dismiss, the remaining counts in the second amended complaint are counts one, two, three, five, and eight.

[2] Count three is against defendant Jason Rosati only. The plaintiff did not file a response in opposition to Rosati's motion for summary judgment, but he does reference his claims against Rosati in his response in opposition to the medical defendants' motion for summary judgment. Because the plaintiff is proceeding pro se, I will construe his response as being in opposition to both motions for summary judgment, and I will not grant defendant Rosati's motion as unopposed. See Higgs v. Atty. Gen. of the U.S., 655 F.3d 333, 339 (3d Cir. 2011), as amended (Sept. 19, 2011) (quotations omitted) (reasoning that the "policy of liberally construing pro se submissions is driven by the understanding that [i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training."). Nonetheless,

**I.      FACTUAL BACKGROUND**[3]

The plaintiff was incarcerated in the Northampton County Prison as of May 14, 2009. (Rosati Statement of Uncontested Material Facts ("RSUMF") ¶ 8.) At the time he entered the jail, he had been released from the hospital and was using a wheelchair for mobility because he had broken bones in his feet and compression fractures in his lower back. (Id. ¶¶ 5–6, 9.) He sustained these injuries while fleeing from police at the time of his arrest, after jumping over a barrier and falling thirty to forty feet onto a hard surface. (Id. ¶¶ 2–4.) His claims stem from the time he spent in the Northampton County Prison while he was recovering from these injuries.

---

Rosati is entitled to summary judgment as to the remaining claim against him for the reasons stated below.

With respect to counts one, two, and eight, the plaintiff seems to concede that defendant Deborah Wilson did not cause or have knowledge of the alleged violations of his rights. (See Pl.'s Resp. Opp'n to Defs.' Mot. Summ. J. 1.) Even without this concession, however, she would be entitled to summary judgment on the claims against her for the reasons stated below.

[3] The recitation of facts is compiled from a review of the parties' statements of facts, briefs, and the evidence submitted in conjunction with those briefs. To the extent the parties allege a fact that is unsupported by record evidence, it is not included in the recitation of facts. Where the parties have specifically cited exhibits attached to their briefs and other submissions, I have reviewed and considered those cited materials. See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Generally, where the items that the plaintiff highlights as "genuine issues of material fact" are not facts, are not material, do not create a dispute of fact relevant to his claims, are not supported by record evidence, or are simply his opinion, they are not included in the recitation of facts. See Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion."); see also Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) ("Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment.") (citation omitted); Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000) ("At summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial.") (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

The facts underlying these claims fall into five categories: assaults on his person, the medical treatment he received, the prison's failure to respond to grievances or coordinate offsite medical treatment, failure to train and to supervise, and negligent infliction of emotional distress.[4]

**A. <u>Alleged Assaults</u>**

The plaintiff initially claimed that on June 6, 2009, defendant Jason Rosati entered his cell and struck his right heel with a billy-club.[5] (Second Am. Compl. ¶¶ 33–34.) The plaintiff later testified at his deposition that the incident occurred in the common area of the medical housing unit. (RSUMF ¶ 12.) The plaintiff could not tell if he had been injured by the assault because his foot was wrapped and was already swollen before the incident. (Deposition of Roger Allen Johnson, March 25, 2014 ("Plaintiff Dep.") 84:11–16.) Prior to filing this lawsuit, the plaintiff wrote about the assault in a letter to a prison official in which he stated "I know [Rosati's] intentions were jokingly [sic]" and that Rosati "struck [him] lightly." (Rosati Ex. C, May 31, 2010 Letter from Plaintiff to Director of Corrections at 4.)[6]

The plaintiff also alleged that Rosati struck his upper left arm with a billy-club on August 6, 2009. (Second Am. Compl. ¶ 35.) The plaintiff later testified at his deposition that he had actually been struck with a broom, and that the resulting bruising, discoloration, and contusions only lasted for thirty minutes and did not require medical treatment. (RSUMF ¶¶ 21–23.) The plaintiff later indicated that he was struck with the straw portion of the broom. (<u>See</u> Pl.'s Resp.

---

[4] The plaintiff has not submitted any facts in support of his failure to train or failure to supervise claims, and the facts submitted by the defendants simply point out these omissions. For that reason, these claims are not discussed in the fact section.

[5] Rosati testified that when he is at the prison he does not have access to the type of weapon the plaintiff described. (RSUMF ¶ 17.)

[6] The plaintiff wrote the letter approximately one year prior to filing this lawsuit.

3

Opp'n to Defs.' Mot. Summ. J. Ex. 12 at 52 (drawing of a broom with an arrow pointing to the straw portion and the words "[t]hat's the part that hit me in the upper left arm").)

### B. Medical Treatment

The plaintiff also sets forth claims regarding his medical treatment at the Northampton County Prison between May 15, 2009 and February 23, 2010, and between March 14, 2010 and September 29, 2010. (Medical Defendants Statement of Undisputed Facts ("MDSUMF") ¶ 6.) These claims concern the administration of pain medication, access to ambulatory assistance equipment, and an episode of severe abdominal pain.

#### 1. Pain Medication

The plaintiff testified at his deposition that he was given pain medication while at the prison; that he sometimes went days without being given medication; that he was never given Tylenol 3 or Ultram; that he had been given Ultram and Tramodol; that he did not remember whether and what medications he had been given; and that it was hard to give yes or no answers to questions about the administration of medication. (Id. ¶¶ 11–21.)

Dr. Gessner, one of the physicians who treated the plaintiff at the prison, testified at her deposition that while the hospital had prescribed Percocet,[7] she provided the plaintiff with alternative pain medications that she believed to be safer. (Id. ¶¶ 24–27.) Such substitutions are permitted per PrimeCare policy. (Id. ¶ 28.)

The plaintiff's Medication Administration Record reflects that he was given pain medication every day between May 15, 2009 and February 22, 2010, except for February 10, 2010 when he refused his pain medication. (Id. ¶ 46.) After he was released and later re-

---

[7] Nurse Caputo testified at her deposition that although the plaintiff received Percocet at the hospital and had a prescription for Percocet from the hospital when he arrived at the prison, her response to his September 4, 2009 grievance was that the hospital did not send a prescription for Percocet. (MDSUMF ¶¶ 34–35.)

4

incarcerated, he also received pain medication every day between March 14, 2010 and September 29, 2010, the day he was transferred out of the prison.[8] (Id. ¶ 58.) The plaintiff's records show that on various occasions he completed medical requests regarding his pain medication and his concerns that he was becoming too tolerant of the medication, that he was having trouble falling asleep, that his pain was not being managed sufficiently, and that he wanted to reduce his pain medications. (Id. ¶¶ 67, 69, 72, 74, 76–77, 79, 81.) His treating physicians responded to these requests by ordering follow-up, increasing his medication or its frequency, decreasing his medication, and renewing prescriptions.[9] (Id. ¶¶ 68, 70–71, 73, 75, 78, 80–81.)

2. **Ambulatory Assistance Equipment**

When the plaintiff arrived at the prison in May 2009 he was using a wheelchair provided by the hospital, and he was permitted to use it in the prison because his left foot was in a cast, his right foot was wrapped, and he was not able to bear weight at that time. (Id. ¶¶ 89–91.) The plaintiff was placed in the prison's medical housing unit, which was equipped with a disability shower and does not have stairs. (Id. ¶¶ 94–95.) After healing issues in the plaintiff's feet were addressed, he was eventually able to have the cast removed and his orthopedic surgeon instructed him to progress to weight-bearing using a walker. (Id. ¶¶ 97–105.) The plaintiff's injuries continued to heal and Dr. Gessner noted that as of December 18, 2009 the plaintiff was able to

---

[8] Additional detailed information regarding the frequency and types of pain medication the plaintiff received is included in the medical defendants' statement of facts. (See MDSUMF ¶¶ 47–56, 59–65.)

[9] Dr. Lawrence Mendel authored an expert report on the defendants' behalf, in which he stated his opinion that the plaintiff's medications were within the applicable standard of corrections care and that Percocet is generally not used in the correctional setting. (MDSUMF ¶¶ 82–84.)

5

get around without using a wheelchair, and the wheelchair was discontinued. (Id. ¶¶ 106–09, 115.)

Also on December 18, 2009, a formal misconduct report was written about the plaintiff because he acted aggressively and disrespectfully towards staff after an officer intercepted a note the plaintiff had written to another inmate, which violated the prison's rules. (Id. ¶ 111.) Later that day, the plaintiff claimed to have fallen in the shower while using a walker. (Id. ¶ 110.) When a nurse arrived the shower floor was completely dry and the plaintiff was wearing slip-resistant flip-flops. (Id. ¶ 114.) The plaintiff was sent to the hospital, where he was diagnosed with contusions and a hematoma. (Id. ¶ 112.) When he returned to the prison, he was placed on suicide watch due to self-injury concerns. (Id. ¶ 113.)

Three days after the fall, the plaintiff underwent a physical therapy outpatient evaluation, where he received instruction in a home exercise program and a rubber band for exercises, and was evaluated and found not to need ambulatory equipment. (Id. ¶¶ 116–17.) A couple of days later, Dr. Gessner confirmed with the plaintiff's physical therapist that he did not need an assistive device to ambulate, discontinued his walker, and cleared him from the medical housing unit on the condition that he would use a Stryker chair for steps. (Id. ¶ 121.) In making these decisions, Dr. Gessner relied in part on the therapist's judgment, but she also considered her observations of the plaintiff's activity level as well as those of the other people in her department. (Id. ¶ 124.) She testified at her deposition that by that time, the plaintiff spent most of his time walking around and was using his wheelchair as a nice place to sit while he watched television. (Id.) She also testified that the plaintiff would not be able to ambulate normally if he became dependent on assistive devices. (Id. ¶ 125.) By contrast, the plaintiff believes that he was transferred out of the medical housing unit for misconduct and that he had the walker when

he was transferred, but also testified that his walker was discontinued as of his transfer. (Id. ¶¶ 126–27.) He testified that his walker was taken away because he was using it to get corrections officers' attention and they were unhappy with him, but he also testified that his physical therapist said he did not need a walker by the time it was taken away. (Id. ¶¶ 128–29.)

After he was transferred out of the medical housing unit, the plaintiff filed a grievance form to express a complaint that the regular unit did not have a handicap shower, that his cell was the farthest down the tier, and that he needed a walker. (Id. ¶ 130.) The grievance response explained that PrimeCare does not decide what cell an inmate is assigned to, that the assignments are based on inmate "classification," and that he had been cleared of using a walker as of his physical therapy visit. (Id. ¶ 131.) Dr. Gessner testified at her deposition that while there were two flights of stairs to leave the regular unit, there were no stairs within the unit, and that inmates did not need to use any steps to get to the shower. (Id. ¶ 133.)

According to the plaintiff's medical records, Dr. Gessner visited him on December 30, 2009, and noted that he had requested a cane and that, although she explained the need for weight-bearing to relearn and regain his abilities, she would discuss getting him a cane with the physical therapist. (Id. ¶ 136.) After speaking with the physical therapist, Dr. Gessner authorized the use of a cane as of January 8, 2010. (Id. ¶ 137.)

The plaintiff was released from custody on February 23, 2010. The plaintiff testified at his deposition that he did not see any doctors or take any pain medications between his release date and February 27, 2010, when he called for an ambulance due to pain after walking in a blizzard with a cane for one or two miles around Easton looking for a place to stay. (Id. ¶¶ 141–43.) His feet were x-rayed and the results showed no new fractures and stable post-operative changes. (Id. ¶ 144.) The plaintiff also called an ambulance on March 14, 2010 when he was in

pain from walking one or two miles that day. (Id. ¶¶ 145–46.) After he left the hospital, the plaintiff stole a car, resulting in his second period of incarceration in Northampton County. (Id. ¶ 147.)

When the plaintiff was booked into the Northampton County Prison, he had his cane and was permitted to use it at the prison. (Id. ¶ 148.) He received x-rays on March 6, 2010 that showed anatomic alignment in his right foot, with no loosening or infection. (Id. ¶ 149.) The plaintiff has not had any surgery since 2009, and although a physician named Dr. Brigido recommended a revision surgery for October 2012, the plaintiff missed the appointment and never rescheduled. (Id. ¶¶ 155–56.) He has not used a wheelchair or walker since being released from SCI Albion in 2012. (Id. ¶¶ 152 –57.) He has not had physical therapy since his incarceration in Northampton County. (Id. ¶ 158.) As of the date of his deposition, he uses a cane two to three times per week when his feet hurt and he has problems standing for more than fifteen to twenty minutes, but the only medication he takes is an anti-inflammatory drug. (Id. ¶¶ 159–60.) The defendants' medical expert found that the plaintiff's wheelchair was discontinued at an appropriate time after consultation with the orthopedic surgeon and that it was not denied when medically necessary; that the walker was an appropriate alternative; that the plaintiff's transfer out of the medical unit occurred when being housed there was no longer medically necessary; and that any displacement of the surgical repair was not the result of inadequate post-operative care. (Id. ¶¶ 161–64.) The plaintiff did not submit an expert medical report.[10]

---

[10] The Third Circuit has stated that "expert testimony is not necessarily required where other forms of extrinsic proof may suffice." Pearson v. Prison Health Serv., 850 F.3d 526, 536 (3d Cir. 2017) (quotation omitted). Thus, I merely note that the plaintiff, who by this time did not have an attorney, did not submit such a report with his response to the defendants' motions for summary judgment.

8

### 3. Abdominal Pain

The plaintiff alleged that on June 20, 2010, he experienced extreme abdominal pain that caused him to vomit and pass out and that he was not medically responded to until several hours after he notified prison officials of his symptoms. (Id. ¶ 168 (citing Second Am. Compl. ¶¶ 57–63, 91–93).) His medical records indicate that when he complained of pain that felt like kidney stones, Nurse Heffren examined him and ordered a urine dip, which was negative for blood in the urine. (Id. ¶ 170.)

## C. Failure to Respond to Medical Grievances or Coordinate Off-Site Medical Treatment

The plaintiff alleged that the medical defendants purposely failed to respond to his medical grievances or coordinate offsite treatment. (Id. ¶ 173 (citing Second Am. Compl. ¶ 64).) As stated above, the plaintiff received medication and diagnostic imaging, visits from nurses, physician assistants, and doctors, and visits with outside providers including an orthopedic surgeon, a physical therapist, and a neurosurgeon. (Id. ¶ 174.) The plaintiff has not submitted an expert report regarding whether any alleged failures resulted in harm. (Id. ¶ 176.)

## D. Negligent Infliction of Emotional Distress

The plaintiff did not file a certificate of merit in connection with his claim that the medical defendants' conduct and provision of medical treatment constituted the negligent infliction of emotional distress. (Id. ¶¶ 186–88.) According to the defendants' expert, the plaintiff's treatment was within the standard of care. (Id. ¶ 189.) The plaintiff did not submit an expert report. (Id. ¶ 190.)

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Id. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary

judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

## III. DISCUSSION

After careful consideration, I find that the defendants are entitled to summary judgment on all claims in the second amended complaint. Based on the evidence in the record, no reasonable fact-finder would be able to return a verdict in the plaintiff's favor on any of his claims. These claims are each discussed below.

### A. Count Three: Cruel and Unusual Punishment, Excessive Force

The plaintiff claims that, on two separate occasions, Jason Rosati deliberately struck him in a way that served no penal purpose, could only serve to injure and cause him pain, and was objectively and subjectively serious. (Second Am. Compl. ¶¶ 98–106.) The evidence in the record that the plaintiff identifies in support of his cruel and unusual punishment and excessive force claims consists of his deposition testimony and his unsworn handwritten notes that he included as exhibits to his response in opposition.[11] (See Pl.'s Resp. Opp'n to Defs.' Mot. Summ. J., Ex 6 at 15–27; Ex. 12 at 53, 55.) As stated above, the plaintiff testified that the first assault did not result in any discernable injuries, and later wrote a letter to prison officials stating

---

[11] The plaintiff claims that Rosati destroyed six or seven months' worth of documentation and recordings of both assaults. (See Pl.'s Resp. Opp'n to Mot. Summ. J. 26.) He also testified at his deposition that Rosati destroyed his documents "to hide his eviltude." (Plaintiff Dep. 92:8–9.) Even assuming that the plaintiff's claim about the destruction of these records are true, and that the plaintiff had contemporaneous notes and recordings showing that the assaults occurred as he described them, the amount of force applied and the degree of the resulting injuries do not rise to the level of Eighth Amendment violations.
 The plaintiff also claims that Rosati "displayed a[n] egregiously [sic] culpability of not one but two needless assaults against Plaintiff by conjecture through his own admonisions [sic]." (Pl.'s Resp. Opp'n to Mot. Summ. J. 31.) The plaintiff's opinion that Rosati's behavior demonstrated culpability is not evidence and does not create a genuine issue of material fact. The plaintiff does not explain what he means by "admonisions," and it is not possible to determine whether he intended to say "admissions" or "admonitions." There is no record evidence showing that Rosati admitted to the alleged assaults.

that the use of force was "light," and that he knew that Rosati's "intentions were jokingly [sic]." (Rosati Ex. C, May 31, 2010 Letter from Plaintiff to Director of Corrections.) As to the second assault, the plaintiff testified at his deposition that he suffered bruises that went away after thirty minutes.

It is not necessary to submit these claims to a jury to weigh the credibility of the plaintiff's testimony about the assaults against Rosati's testimony. Even if the assaults occurred as the plaintiff described them, they do not rise to the level of constitutional violations both because of the amount of force applied and the nature of the resulting injuries. While it is the case that "the Eighth Amendment analysis must be driven by the extent of the force and the circumstances in which it is applied; not by the resulting injuries," Smith v. Mensinger, 293 F.3d 641, 648 (3d Cir. 2002) (citation omitted), "it is [also] true that the Eighth Amendment does not protect an inmate against an objectively de minimis use of force." Id. (citing Hudson v. McMillan, 503 U.S. 1, 9–10 (1992). "[T]he pivotal inquiry in reviewing an inmate's § 1983 claim for excessive force is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Smith, 293 F.3d at 649 (quoting Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (citing Hudson, 503 U.S. at 7)). Courts consider several factors in this analysis:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response.

Brooks, 204 F.3d at 106 (citing Hudson, 503 U.S. at 7).

While there is no evidence that Rosati acted to maintain or restore discipline, there also is evidence—the plaintiff's description of the incidents—which indicates that Rosati did not act

maliciously or sadistically in order to cause harm. Indeed, based on the record evidence submitted by the parties, "even if a jury found [the plaintiff's] allegations to be credible, given the totality of the circumstances, no jury could find that the force used rose to the level of a constitutional dimension." Reyes v. Chinnici, 54 F. App'x 44, 48 (3d Cir. 2002). As to the first three factors discussed in Brooks, it appears that while there was no "need" for Rosati to apply force to the plaintiff, the amount of force used was "light," and the extent of the injuries were non-existent in the first instance and de minimis in the second. As to the fourth factor, based on the plaintiff's descriptions of the incidents there was no threat to the safety of staff or inmates. With respect to the fifth factor, any effort to temper the severity of the force is unknown, other than the plaintiff's description of Rosati's intentions as "jokingly." In sum, the plaintiff has accused Rosati of applying light force in a joking manner resulting in minimal or no injury, and of applying force that caused bruising or redness that went away after thirty minutes. Based on the plaintiff's account, Rosati's use of force against the plaintiff did not rise to the level of a constitutional violation. Rosati is entitled to summary judgment on count three, and his motion for summary judgment is granted.

**B. Counts One, Two, Five, and Eight: Cruel and Unusual Punishment, Right to Medical Care, Failure to Train and Supervise, and Negligent Infliction of Emotional Distress**

The plaintiff asserts that the medical defendants withheld prescribed pain medications and ambulatory assistance equipment, did not respond to his abdominal pain, failed to respond to his medical grievances or coordinate the necessary offsite treatment, and committed the tort of negligent infliction of emotional distress. (See Second Am. Compl. ¶¶ 139–45.) He also alleges that PrimeCare failed to properly train and supervise its employees. (Id. ¶¶ 115–121.)

1. **Counts One and Two: Cruel and Unusual Punishment as to Medical Care**

"The Eighth Amendment prohibits prison officials from being deliberately indifferent to an inmate's serious medical needs." Palakovic v. Wetzel, 854 F.3d 209, 227 (3d Cir. 2017) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). "In order to sustain this constitutional claim under 42 U.S.C. § 1983, a plaintiff must make (1) a subjective showing that the defendants were deliberately indifferent to [his or her] medical needs and (2) an objective showing that those needs were serious." Pearson v. Prison Health Serv., 850 F.3d 526, 534 (3d Cir. 2017) (quotations omitted). "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." Giles v. Kearney, 571 F.3d 318, 330 (3d Cir. 2009). "A medical need is serious where it 'has been diagnosed by a physician as requiring treatment' or is 'so obvious that a lay person would easily recognize the necessity' of medical attention." Palakovic, 854 F.3d at 227 n.23 (quoting Monmouth Cty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d, 326, 347 (3d Cir. 1987)).

The Third Circuit has emphasized that "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." Palakovic, 854 F.3d at 227 (citing Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993)). "Allegations of mere negligent treatment or even medical malpractice do not trigger the protections of the Eighth Amendment." Id. (citing Estelle, 429 U.S. at 105–06). Thus, "decisions by prison medical staff relating to the exercise of professional judgment, even though they may constitute medical malpractice, are not violative of the Eighth Amendment." Thomas v. Dragovich, 142 F. App'x 33, 36 (3d Cir. 2005) (citing Estelle, 429 U.S. at 107). The Third Circuit has previously explained that "'mere disagreement as to the proper medical treatment' is likewise insufficient to

establish a Constitutional violation." Thomas, 142 F. App'x at 36 (quoting Monmouth County Corr. Institutional Inmates, 834 F.2d at 346).

In this case, the extensive medical records and documentation of the plaintiff's treatment do not establish that the medical defendants were deliberately indifferent to his serious medical needs.[12] These records show that the plaintiff received pain medication, and that the choice of which medications to prescribe and the dosage of those medications were tailored to his needs and the concerns he expressed to the medical staff. The plaintiff's unsupported opinions about the falsified nature of these records are not evidence. See Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) ("Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment.") (citation omitted). Plaintiff asserts that his records were altered "to cover the fact that Dr. Gessner failed to provide Percocet" and states that the entries in his medical records "lead[] to the conclusion of fraud." (Pl.'s Resp. Opp'n to Defs.' Mot. Summ. J. 13). And yet, the plaintiff also states that he knows his belief about the records is "speculation." (Id. at 15.) The plaintiff's speculation, without more, is insufficient to establish that the defendants were deliberately indifferent to his medical needs.

In sum, the plaintiff's opinions and assertions show that he disagreed with his treatment, but they do not create genuine issues of material fact with respect to his claims. No reasonable jury presented with the plaintiff's medical file from his time in the Northampton County Prison would find in his favor on his claims regarding the administration of pain medication, his access

---

[12] I will construe the plaintiff's submissions as setting forth the required objective showing that his medical needs were serious for purposes of his claims against the medical defendants. The injuries underlying the deliberate indifference claim against the medical defendants are distinct from the injuries underlying his excessive force claim against Rosati. Accordingly, I can both assume that his medical needs were serious and also conclude, as I did above, that he did not sustain serious injuries as a result of the alleged assault by Rosati.

15

to ambulatory assistance equipment, and the treatment provided in response to his episode of abdominal pain. Similarly, the record evidence in this case shows that the medical grievances were responded to and that he received care with off-site providers, and no reasonable jury would find in his favor as to those claims. Accordingly, the medical defendants are entitled to summary judgment as to the plaintiff's claims in counts one and two.

### 2. Count Five: Failure to Train and Failure to Supervise

"[Third Circuit] jurisprudence is clear that when a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." McTernan v. City of York, 564 F.3d 636, 657 (3d Cir. 2009) (internal citations and quotations omitted). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick v. Thompson, 563 U.S. 51, 131 S. Ct. 1350, 1359 (2011). The failure to train "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick, 131 S. Ct. at 1359 (quoting City of Canton v. Harris, 489 U.S. 378, 388, (1989). To establish deliberate indifference on a failure to train claim, a plaintiff "must present evidence that shows both: (1) knowledge that a federally protected right is substantially likely to be violated . . . , and (2) failure to act despite that knowledge." S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 265 (3d Cir. 2013) (internal citation omitted). "In addition to proving deliberate indifference, a plaintiff must also demonstrate that the inadequate training caused a constitutional violation." Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004) (citing Grazier v. City of Phila., 328 F.3d 120, 124–25 (3d Cir. 2003)). "There must

be 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" Carswell, 381 F.3d at 244–45 (quoting Brown v. Muhlenberg Township, 269 F.3d 205, 214 (3d Cir. 2001); Canton, 489 U.S. at 385)).

As for failure supervise claims, "supervisors are liable only for their own acts" and "only if they, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" Wharton v. Danberg, 854 F.3d 234, 243 (3d Cir. 2017) (quoting A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989) (alteration in original)).

Here, the plaintiff has not identified the training that should have been provided, or set forth any facts to show that the current training created a risk of violating inmates' constitutional rights or that there was a supervisory practice or procedure that created a risk of violating inmates' constitutional rights. Instead, he argues that:

> the Medical Defendants intentionally and in noncompliance with established policies and procedures purposefully altered Medical Records, falsified medical documents in attempts to justify unsound medical diagnosis and in by [sic] doing so shows [. . .] a failure to train or supervise.

(Pl.'s Resp. Opp'n to Defs.' Mot. Summ. J. 1–2.) The plaintiff has not submitted any evidence to support this circular and conclusory allegation that the medical records were altered.[13] No

---

[13] The plaintiff's conclusory assertions that "[t]he deficiency in the Defendants' training program and the informal custom of recklessly ignoring the medical needs of prisoners throughout the prison facility is directly related to [his] ultimate injuries," and that therefore the medical defendants are "subject to 'Monell liability,'" are not "facts", but rather his opinion, and therefore do not create genuine issues of material fact precluding summary judgment. (Pl.'s Resp. Opp'n to Defs.' Mot. Summ. J. 12.) In addition, the plaintiff admits that these allegations are mere "speculation," (id. at 15), which does not create an issue of material fact precluding summary judgment.

reasonable jury would find in his favor on his failure to train or failure to supervise claims, and PrimeCare Medical, Inc. is therefore entitled to summary judgment as to those claims.

### 3. Count Eight: Negligent Infliction of Emotional Distress

In Pennsylvania, "the cause of action for negligent infliction of emotional distress is restricted to four factual scenarios: (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative." Weiley v. Albert Einstein Med. Ctr., 51 A.3d 202, 217 (Pa. Super. Ct. 2012) (citing Doe v. Philadelphia Community Health Alternatives AIDS Task Force, 745 A.2d 25, 26 (Pa. Super. Ct. 2000), aff'd, 767 A.2d 548 (Pa. 2001); see also Goodson v. Kardashian, 413 F. App'x 417, 418 (3d Cir. 2011) (describing the required elements of a claim for negligent infliction of emotional distress in Pennsylvania).

Here, the plaintiff alleged that the medical defendants owed him a duty of care that was breached, that he suffered a physical impact, and that he was in the "zone of danger" and at risk of an immediate physical injury. (Second Am. Compl. ¶¶ 139–44.) As to the first scenario, nothing in the record evidence set forth by the parties establishes that the medical defendants breached their duty of care to the plaintiff. As discussed above, he received appropriate pain medication, had access to the necessary ambulatory assistance equipment at each phase of his recovery, was treated by a physical therapist, and underwent appropriate testing during the episode of abdominal pain he experienced. As to the second scenario, the plaintiff did not identify a physical impact giving rise to his claim.[14] As to the third scenario, the plaintiff would

---

[14] As noted above in footnote twelve, the plaintiff's excessive force claim against Rosati is separate from his claims against the medical defendants. The physical impacts during the

not have been in a "zone of danger" because he was receiving adequate medical care, and thus any fear he had of impending physical injury was not reasonable. In light of these failings, as well as the record evidence submitted by the parties, no reasonable jury would find in the plaintiff's favor as to his negligent infliction of emotional distress claim. The medical defendants are therefore entitled to summary judgment on count eight.[15]

## IV. CONCLUSION

In light of the foregoing, I find that the plaintiff has not established the existence of genuine issues of material fact with respect to any of the counts in the second amended complaint. By contrast, and as discussed above, I find that the defendants have established their right to summary judgment as to the entirety of the second amended complaint.

An appropriate Order follows.

---

alleged assaults cannot be attributed to the medical defendants for purposes of the negligent infliction of emotional distress claim.

[15] The plaintiff also failed to submit the required certificate of merit in support of his state law negligent infliction of emotional distress claim, which is based on his allegations that the medical defendants did not provide him with proper medical care. See Pa. R.C.P. No. 1042.3(a) ("In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party."). Pennsylvania does not exempt pro se litigants from this requirement. See, e.g., Hoover v. Davila, 862 A.2d 591, 595 (Pa. Super. Ct. 2004) ("A pro se litigant is not absolved from complying with procedural rules.") (citation omitted); see also Perez v. Griffin, 304 F. App'x 72, 74–75 (3d Cir. 2008) (explaining that, while failing to submit a certificate of merit is not fatal to a claim if a plaintiff shows a reasonable excuse for noncompliance, ignorance of or mistake as to the rule is not an excuse) (citing Womer v. Hilliker, 908 A.2d 269, 279–80 (Pa. 2006) and Hoover, 862 A.2d at 595–96). The medical defendants are entitled to summary judgment on count eight for this reason as well.